**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

RANDALL ELLIOTT,

                 **Plaintiff,**

      **v.**

REYNOLDS METALS COMPANY, LLC,

                 **Defendant.**

**Case No. 20 C 5689**

**Judge Harry D. Leinenweber**

## MEMORANDUM OPINION AND ORDER

The case arises out of a Fair Labor Standards Act ("FLSA") and Arkansas Minimum Wage Act ("AMWA") action brought against Defendant Reynolds Company ("Reynolds") by a former employee, Randall Elliott ("Elliott"). Elliot's Complaint alleges that Reynolds violated the FLSA and the AMWA by failing to provide Elliott overtime pay for the hours he worked over forty hours per week during his employment as a Production Supervisor at Reynolds. Defendant now moves for Summary Judgment (Dkt. No. 27) on the issue of whether Elliot was an executive employee and therefore exempt from the FLSA's overtime pay.

For the reasons stated herein, the Court denies Defendant's Motion for Summary Judgment.

## I. FACTS

Because the details of Elliott's job responsibilities and activities will be discussed in further detail below, the Court

need only describe the general operations of Reynolds and the general role of Production Supervisors at the aluminum plant.

Reynolds operates a facility in Malvern, Arkansas, where aluminum is alloyed to the correct specifications, broken down, cast, pressed, rolled, and then shipped to another facility in Louisville, Kentucky that turns the prepared aluminum into aluminum foil. Reynolds hired Elliott in 2013 as a Production Supervisor in its Arkansas facility, a role he worked in until his termination in August 2020. Elliott was not a union employee, but he did supervise a shift of union employees on the production line in the cast house. Elliott was assigned to supervise a team of up to twenty-three union production and maintenance employees but spent most of his time managing a team of six production employees on his shift. There were four shifts, so four cast house supervisors in total. Elliott worked three on/three off, 12-hour shifts that rotated from days to nights. As a result, some weeks he worked 36-hour workweeks and others he worked 48-hour workweeks. From 2017 through the end of Elliott's employment in 2020, the Malvern facility was party to a collective bargaining agreement ("CBA") that governed employment, including hiring, firing, and promotions, of the union employees.

## II.  LEGAL STANDARD

Summary judgment is appropriate if the record, including "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Lawson v. CSX Transp., Inc.,* 245 F.3d 916, 922 (7th Cir. 2001) (quoting Fed. R. Civ. P. 56(c)). At this stage, the question is not one of weighing evidence, but rather to determine whether there is any genuine issue for trial. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249 (1986). "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587 (1986) (internal quotation marks and citation omitted).

## III.  ANALYSIS

### A.  Plaintiff's Response to Defendant's 56.1 Statement of Facts

In its Reply brief, Defendant argues that Plaintiff's Response to Defendant's 56.1 Statement of Facts fails to comply with Federal Rule of Civil Procedure 56 and Local rule 56.1 so pervasively that that Plaintiff's Response should be stricken in its entirety and all of Defendant's statements deemed admitted.

The Seventh Circuit has emphasized the importance of Local Rule 56.1 compliance, and when a responding party fails to controvert the moving party's statement of facts in accordance with the rule, Rule 56.1's enforcement provision provides that those facts shall be deemed admitted. *See* N.D. ILL. L.R. 56.1(b); *see also Smith v. Lamz,* 321 F.3d 680, 683 (7th Cir. 2003). While a district court is permitted to require strict compliance with the Rule, it is within the court's discretion to determine how strictly to apply its own rules. *Traum v. Equitable Life Assurance Soc'y of the U.S.,* 240 F.Supp. 2d 776, 780 (N.D. Ill. 2002) (citing *Bordelon v. Chi. Sch. Reform Bd. of Trs.,* 233 F.3d 524, 527 (7th Cir. 2000)). A district court is not required to "wade through improper denials and legal argument in search of a genuinely disputed fact." *Bordelon v. Chi. Sch. Reform Bd. of Trs.,* 233 F.3d 524, 529 (7th Cir. 2000).

The Court agrees that several of Plaintiff's responses violate Local Rule 56.1 by avoiding a direct response to Defendant's facts, or by improperly including additional facts. For example, Plaintiff admits Defendant's SMF ¶ 14, which states that Plaintiff was not a union employee but supervised a shift of union employees. But Plaintiff also goes on to deny that Plaintiff's "only or primary job duty involved supervising union employees" — a gloss Defendant did not mention in the fact – and

incorporates additional improper facts regarding what Plaintiff's "main" work was. (Pl. Resp. to Def. SMF ¶ 14.) Rather than parse each of Plaintiff's responses to determine which of Defendant's facts the Court will deem admitted, the Court will address only those facts the Court finds material to the decision as they arise.

## B. Executive Exemption

The FLSA and AMWA require that an employee receive overtime pay if he or she works more than forty hours in a week. 29 U.S.C. § 207(a)(1); Arkansas Code Annotated (A.C.A.) § 11-4-211(a). However, this requirement does not apply to "any employee employed in a bona fide executive . . . capacity." 29 U.S.C. § 213(a)(1); A.C.A. § 11-4-203(3)(A). The U.S. Department of Labor has promulgated regulations that describe and interpret the scope of this exemption. 29 C.F.R. § 541.100 et seq. (2019). These federal regulations were adopted by the Arkansas Department of Labor with respect to the AMWA. AMWA Administrative Rules § 010.14-106. As a result, we need only consider federal law on this issue. *See Garrison v. ConAgra Foods Packaged Foods, L.L.C.,* 2015 WL 366431, at *17 (E.D. Ark. Jan. 6, 2015).

Under the applicable regulations, Plaintiff falls within this "executive exemption" if:

> (1) He is compensated on a salary basis at a rate of at least $684 per week;

- 5 -

(2)  His primary duty is management of the enterprise or a customarily recognized department or subdivision thereof;

(3)  He customarily and regularly directs the work of two or more other employees; and

(4)  He has the authority to hire or fire other employees or his suggestions and recommendations as to the hiring, firing, advancement, promotion or any other change of status of other employees are given particular weight.

*See* 29 C.F.R. § 541.100(a). The analysis is a fact-intensive one. *See Roe-Midgett v. CC Servs., Inc.,* 512 F.3d 865, 870 (7th Cir. 2008).

Elliott does not contest that Reynolds satisfies the first and third requirements. At all relevant times, Reynolds paid Elliott an annual salary, not inclusive of monthly premium pay and discretionary bonuses, of $67,161.45. This equates to a salary of $1,291.57 per week, which is well over the requisite $684 per week and therefore satisfies the salary basis test. Additionally, at all relevant times, Elliott "customarily and regularly directed the work of two or more employees," as Plaintiff testified during his deposition that he at minimum supervised no fewer than six employees. (Elliott Dep. 61:12-63:11.)

Accordingly, the Court will move to the second and fourth requirements — whether Elliott's primary duty as a supervisor was management, and whether his suggestions and recommendations as to the hiring, firing, promotion, or any other change of status of

employees were given particular weight. The evidence before the Court consists of Plaintiff's deposition testimony, resume, and performance reviews, as well as an affidavit from Plaintiff.

### 1. Primary Duty

The second requirement for the FLSA's executive exemption is that the employee's "primary duty" was "management of . . . a customarily recognized department or subdivision thereof." 29 C.F.R. § 541.100(a)(2). An employee's "primary duty" is his "principal, main, major or most important duty[,]" and the regulations provide a non-exclusive list of activities that constitute "management":

> interviewing, selecting, and training of employees; setting and adjusting their rates of pay and hours of work; directing the work of employees; maintaining production or sales records for use in supervision or control; appraising employees' productivity and efficiency for the purpose of recommending promotions or other changes in status; handling employee complaints and grievances; disciplining employees; planning the work; determining the techniques to be used; apportioning the work among the employees; determining the type of materials, supplies, machinery, equipment or tools to be used or merchandise to be bought, stocked and sold; controlling the flow and distribution of materials or merchandise and supplies; providing for the safety and security of the employees or the property; planning and controlling the budget; and monitoring or implementing legal compliance measures. 29 C.F.R. § 541.700, 541.102.

This determination is based on the totality of the circumstances, and factors to consider include:

the relative importance of the exempt duties as compared with other types of duties; the amount of time spent performing exempt work; the employee's relative freedom from direct supervision; and the relationship between the employee's salary and the wages paid to other employees for the kind of nonexempt work performed by the employee. 29 CFR § 541.700(a).

Without citing to any cases or responding to those cited by Defendant, Plaintiff argues that his primary duty as a Production Supervisor was not managerial because (1) his primary work was in manual labor on the production line, particularly in setting-up the caster machine; and (2) the activities he performed that Defendant deems "managerial," were in fact not managerial because they were dictated either by the CBA, governed by Defendant's standards, or generally not sufficiently managerial.

The evidence supports that Elliott's primary duty as a Production Supervisor was management. First, Elliott performed most of the duties the regulation describes as "management," though it is well-established he need not perform all of them for this requirement to be satisfied. *See Brown v. Aleris Specification Alloys, Inc.,* 2016 WL 1183207, at *4 (N.D. Ind. Mar. 28, 2016). The thrust of Elliott's work was to ensure the line ran smoothly. This required training of his employees, safety compliance and auditing, timekeeping and vacation approval, supervision and direction of his employees, and production and safety recordkeeping. When a new worker joined his crew, Elliott would

- 8 -

ensure the person had appropriate protective equipment, and familiarize that person with the plant. (Def. SMF ¶ 21.) During a shift, Elliott walked up and down his cast line to check on his crew, check furnace temperatures, check samples, and monitor for safety concerns. (*Id.* ¶23.) As a supervisor, Elliott had "all kinds of" paperwork that management expected he fill out regarding safety, furnace temperatures, and other aspects of production to monitor. (Elliott Dep. 21:14-20.) Elliott was also responsible for requesting the re-stocking of certain supplies, performing monthly safety audits, ensuring adequate coverage, and occasionally assigning certain crew members to different duties at the beginning of the shift. (*Id.* 87:7-10.) At times, Elliott determined the work techniques to be used, and could direct his crew to do something differently if needed. (*Id.* 87:11-88:17; 52:22-53:11.) Plaintiff held pre-shift meetings every day with his crew, which included discussions about safety and the plan for the day. (Def. SMF ¶ 47.) These constitute "managerial" activities under the regulations.

Plaintiff reasons that because the CBA governed the ability to take vacation and work overtime, or because Defendant, and not Plaintiff, determined the production standards, Defendant cannot satisfy the primary duty test. Courts have rejected these exact arguments under similar circumstances — even where certain

managerial functions in a work environment are controlled by external standards and thus removed from supervisor discretion. *Brown v. Aleris,* 2017 WL 1183207 (N.D. Ind. Mar. 28, 2016) and *Beauchamp v. Flex-N-Gate L.L.C.,* 357 F.Supp. 2d 1010 (E.D. MI 2005) are instructive here. In *Brown,* the plaintiff served as a production supervisor at an alloy plant. The Court in *Brown* noted that despite the fact that a CBA dictated hours and pay of the employees in the plaintiff's crew, the plaintiff's primary duty was nevertheless management because he, among other things, "approved requests for time off," was in charge of training, had the "authority to administer discipline," and ensured compliance with safety. 2016 WL 1183207, at *5. In *Beauchamp,* the Court similarly acknowledged that the automotive assembly plant at which plaintiff served as a production supervisor was a "closely controlled environment" governed by strict automotive industry standards and a CBA that "limit[ed] the discretion exercised by supervisors in carrying out their oversight function." 357 F.Supp. 2d 1010, 1017 (E.D. Mich. 2005). It nevertheless found defendants satisfied this requirement because "[e]nsuring the company polices are carried out constitutes the very essence of supervisory work." *Id.* (citing *Donovan v. Burger King Corp.,* 672 F.2d 221, 226 (1st Cir. 1982)).

The evidence also supports that Elliott spent considerable time on managerial work even if he spent much of his day doing production work. Performance reviews of Elliott note that training his crew "assumed a lot of [] [Elliott's] time." (Dkt. No. 29-6 at 7.) *See Ely v. Dolgencorp, L.L.C.,* 827 F.Supp. 2d 872, 886 (E.D. Ark. 2011) ("In addition to the work performed, the Court should also consider Ely's job description, *performance review criteria,* bonus plan, and training.") (emphasis added) (internal quotations omitted). Elliott testified that he was "pretty much always" training someone on his line. (Elliott. Dep. 64:12-15; 139:9-11.) He also said that his crew was almost always comprised of "inexperienced" employees, and that he "had the least experienced caster operators in the plant," which further supports that he spent much of his time training and supervising. (*Id.* 101:22-102:5.) He testified that he led "by example," which suggests that at times his production work was in service of training. (*Id.* 72:4-7.) He also testified that he chose not to "sit in the office like some supervisors" but rather elected to "stay in the center of the cast line" so he could handle problems as they arose. (*Id.* 103:1-6.)

Even if Elliott did spend the majority of his time doing manual production line casting work, this would not disqualify him from the executive exemption. Both the regulations and the courts,

including the Seventh Circuit, adopt the concept of "concurrent" exempt and non-exempt work. An employee's primary duty may be management even if her management and non-management functions overlap. 29 C.F.R. § 541.106. *See Millikan v. Town of Ingalls,* 2022 WL 3928516, at *2 (7th Cir. 2022) (concurrent managerial and nonmanagerial work did not disqualify plaintiff from exemption); *In re Family Dollar FLSA Litig.,* 637 F.3d 508, 515-16 (4th Cir. 2011) (holding that plaintiff was exempt even though she spent 99% of her time on non-exempt duties because she concurrently supervised the store).

The regulations list factors to consider in this inquiry as well: (1) the relative importance of the exempt duties as compared with other types of duties; (2) the employee's relative freedom from direct supervision; and (3) Elliott's salary compared to his crew's wages. First, if Elliott failed to perform his managerial duties — particularly ensuring compliance with safety and production regulations and training employees — his production line would not function at all. *See, Donovan,* 675 F.2d at 521 (noting that this factor requires a consideration of which responsibilities are more "important or critical to the success of the [business]"); *See Brown,* 2016 WL 1183207, at *5 (finding managerial work more important than his manual labor because

"[plaintiff] could stand in for a missing worker on the line, but they could not stand in for him.")

Second, Elliott testified that on night shifts, which were his every other shift, there was "very few [sic] management" and that he did not "have the maintenance supervisors" on these shifts. (Elliott Dep. 26:15-19; 32:18-21; 105:3-106:12.) Even during day shifts Plaintiff testified that his supervisors mostly stayed in the office, would "never come [sic] out of it," and would only occasionally spend time on the production floor. (*Id.* 103:1-6.)

Third, Plaintiff submits that he earned the same if not less than his unionized crew when accounting for the overtime pay his crew received. (Pl. Aff. ¶ 29). Here, Elliott's hourly wage amounted to $30.75 in 2017, $31.98 in 2018, $32.10 in 2019, and $34.14 in 2020. (Def. SMF ¶ 52.) Plaintiff submits that this is not material because it does not include "all compensation including non-discretionary bonuses." (Pl. Resp. to Def. SMF ¶ 52.) The Court disagrees. Hourly wage is one way of computing Plaintiff's salary to be able to compare it to the crew members' wages. *See Thomas v. Speedway SuperAmerica L.L.C.,* 506 F.3d 496, 508-09 (6th Cir. 2007) (comparing plaintiff's salary using calculated hourly wage). The unionized employees received less than Elliott per hour — $23.93 per hour in 2017, $24.53 per hour in 2018, $25.14 per hour in 2019, and $25.77 per hour in 2020.

(Def. SMF ¶ 53.) Plaintiff argues these calculations are not accurate because they do not include the crew's overtime and bonuses. (Pl. Resp. to Def. SMF ¶ 53.) The Sixth Circuit expressly rejected similar arguments in *Thomas v. Speedway*. There, the plaintiff argued that the court should compare what plaintiff made for overtime (nothing) against what her subordinates earned for overtime. 506 F.3d at 509. The court found that this argument "seriously misapprehend[ed] the inquiry demanded by the fourth element," which instructs the Court to compare Elliott's base salary with his crew's wages and does not mention overtime pay at all. *Id.* The fact that Plaintiff's salary was higher than his crew's wages is not seriously disputed.

Upon consideration of the five factors identified, the Court finds that Elliott's primary duty was management.

### 2. *Recommendations as to Hiring, Firing or Any Other Change of Status Given Particular Weight*

The fourth and final requirement of the executive exemption is the requirement most heavily disputed by the parties. This requirement requires the Court to determine whether Elliott's "suggestions and recommendations as to the hiring, firing, advancement, promotion or any other change of status of other employees are given particular weight." 29 C.F.R. § 541.100(a)(4). Relevant factors in determining whether an employee's suggestions about hiring, firing, and promotion were given particular weight

- 14 -

are whether the employee was responsible for making such suggestions, how frequently the employee made suggestions or was asked to make them, and how frequently the employee's suggestions were relied upon. 29 C.F.R. § 541.105. Caselaw on this issue is not only highly fact-dependent but also "not consistent." *Davis v. Mountaire Farms, Inc.,* 453 F.3d 554, 558 (3rd Cir. 2006). For the reasons set out below, Defendant did not satisfy this requirement.

Both parties concede that Elliott did not have any authority over the hiring or termination of employees on his crew, as this was dictated by the CBA and Human Resources ("HR"). Consistent with the CBA, every new production employee at Reynolds is hired on a probationary basis for 90 days. After the 90-day probationary period, new employees are placed on the seniority roster, and the CBA governs their eligibility for additional promotions. Elliott testified that he did not believe that, during his employment, there was a single union employee who completed his or her probation period who was not hired, or a union employee who was permanently terminated. (Def. SMF ¶¶ 36, 37.) Elliott describes at great length the restraints the CBA wielded over other employee operations as well: scheduling, overtime, and hiring, noting that he was only allowed to have a certain number of operators off at any given time, and that he followed "CBA-prescribed process[es]" of selecting employees for needed coverage or overtime from a call-

out list dictated by the CBA. (Pl. SMF ¶ 18.) Defendant contends this factor nevertheless weighs in its favor because Plaintiff maintained influence over vacation and time entry, and could discipline employees and verbally recommend termination of employees.

The Court disagrees. Defendant supplies sparse evidence of Elliott's influence over personnel decisions, and even more sparse evidence that Defendant gave these recommendations particular weight. It consists of the following, largely derived from Elliott's deposition only: Elliott, on one occasion, verbally recommended an employee be let go, but his recommendation was not heeded. (Def. SMF ¶ 36.) Elliott could approve or deny members' vacation requests and on one occasion turned down a vacation request. (*Id.* ¶ 27.) Elliott "rarely" assigned someone work who was on overtime, from which the Court can infer on at least one occasion he did so. (Elliott Dep. 87:7-10.) Elliott had the authority to call law enforcement and suspend any employee who was threatening harm, though it is not clear from the record whether Elliott could suspend an employee for safety violations or other infractions, for example, or initiate the CBA's progressive disciplinary procedures. (*Id.* 91:23-92:8.) Defendant asserts that Elliott had the unilateral authority to suspend someone pending investigation, (Def. SMF ¶ 26), but Elliott's deposition testimony

- 16 -

clarifies that this authority was limited to authority to request that law enforcement remove a threatening team member. (Elliott Dep. 91:23-92:8.) Elliott was responsible for maintaining production line coverage but selected the replacement worker from a CBA-governed call-out list. Elliott had the authority to approve or input crew members' time, though needed approval to change anyone's time. (*Id*. 94:19-96:24.) Elliott could request HR write up one of his employees for discipline but cited no evidence of ever having done this or evidence he was able to write someone up himself. Elliott was provided paperwork to evaluate his crew, though never once filled it out and was never asked about it. (*Id*. 84:1-7.)

It is true that in this analysis courts account for the ways the work environment is regulated or constrained by, for example, a CBA or external regulations. The fact that Elliott lacked influence over personnel decisions like hiring and firing and scheduling, which are governed by the CBA, is not fatal to the exemption. *See Rooney v. Town of Groton,* 577 F.Supp. 2d 513, 531 (D. Mass. 2008); *Beauchamp,* 357 F.Supp.2d at 1018 ("[] a possible correlation between a highly regulated work environment and a lesser degree of employee discretion have little bearing upon Plaintiff's classification as an 'executive' in this case") (internal quotations omitted). Yet despite this context-specific

- 17 -

analysis, there still exists a genuine dispute of material fact here. The cases Defendant cites supply far more evidence than is supplied here of the plaintiff's involvement in personnel decisions, as well as of the "particular weight" defendants gave plaintiff's recommendations. In *Brown,* for example, the court determined plaintiff, also a production supervisor who performed both supervisory and manual labor on a production line, qualified as exempt in light of the following: job descriptions of production supervisors that included employee appraisal and recommendations; plaintiff's testimony that defendant would verbally inquire about employee evaluations; authority to issue oral and written warnings to line employees; authority to administer progressive discipline, and temporary suspensions for safety violations; defendant's sworn statement that management determined new hires based on production supervisors' suggestions, including plaintiff's. *Brown,* 2016 WL 1183207, at *7–8.

The Court in *Brown* found the plaintiff qualified as exempt, noting that "numerous courts have found that the recommendations of supervisors in unionized environments were given particular weight where the supervisor could initiate progressive disciplinary procedures and/or where the company relied on suggestions about probationary or temporary employees." *Id.* at *8 (collecting cases). But the evidence from the "unionized

- 18 -

environments" in these union cases cited by the *Brown* court was more robust than here as well. In *Scott v. SSP America, Inc.,* plaintiff recommended hourly employees for promotion; the record included testimony that at least three promotions were based on plaintiff's recommendations; and plaintiff gave performance reviews which were considered in employee pay raise. 2011 WL 1204406, at *14 (E.D.N.Y. Mar. 29, 2011). In *Garrison v. ConAgra Foods Packaged Foods, L.L.C.,* plaintiffs initiated discipline against many employees pending investigation, who defendant ultimately suspended or discharged "most of the time to always" as a result of the recommendations. 2015 WL 366431, at *15. In *Beauchamp,* the determination that a temporary worker should no longer work was based upon plaintiff's and other supervisors' recommendations. 356 F.Supp. 2d at 1016. Further, plaintiff conducted yearly reviews of the hourly employees, as well as disciplined them. *Id.*

*Schreckenback v. Tenaris Coiled Tubes, L.L.C.* is distinguishable for similar reasons. There, the plaintiff was unable to testify "as to any occasion when he recommended discipline and his recommendation was not followed" [by higher management]. 2013 WL 178126, at *7 (S.D. Tex. Jan. 16, 2013). Despite the fact that Plaintiff's recommendations need not be heeded for Defendant to satisfy this requirement, there is a dearth

of evidence that Defendant gave Plaintiff's personnel decisions "particular weight." *See Millikan v. Town of Ingalls,* 2021 WL 9385237, at *8 (S.D. Ind. Apr. 22, 2021). The Seventh Circuit interpreted the "particular weight" portion of the statute in *Millikan v. Town of Ingalls,* 2022 WL 3928516, at *2 (7th Cir. Aug. 31, 2022). There, despite a small "sample size" of only two recommendations that the plaintiff made regarding new applicants — only one of which the defendant followed — the Court found the plaintiff exempt. *Id.* But again, the evidence in *Millikan* was more robust: the plaintiff's job description expressly included involvement in hiring and firing, the plaintiff conducted new hire interviews and "played an integral role in the new hire and promotion process on the few occasions that presented itself during his tenure," and the defendant testified that it "gave weight" to the plaintiff's recommendations. *Id*; *Millikan,* 2021 WL 9385237, at *8. Finally, while influence over vacation and training have been factored in courts' decisions weighing in defendants' favor, the evidence in those cases again was more substantial than here. *See Holt v. City of Battle Creek,* 925 F.3d 905, 912 (6th Cir. 2019); *Martin v. Yokohama Tire Corp.,* 2013 WL 6002344, at *11 (W.D. Va. Nov. 12, 2013); *Lovo v. American Sugar Refining,* 2018 WL 3956688, at *12 (D. Md. Aug. 17, 2018).

All the Court is left with is one denial of vacation pay, the ability to call law enforcement in the event of safety risks, one un-heeded recommendation to let someone go, and one assignment of overtime to an employee. Although Defendant met three of the elements for executive exemption under the FLSA, it failed to establish the fourth. Whether Reynolds gave Elliott's recommendations regarding personnel decisions particular weight is an issue ripe for a trier of fact.

### C.  Combination Exemption

In the alternative, Defendant argues that Plaintiff is exempt under the combination exemption accounting for Plaintiff's managerial and administrative work, as set forth in 29 C.F.R. § 541.708, which states: "Employees who perform a combination of exempt duties as set forth in the regulations in this part for executive, administrative, professional, outside sales and computer employees may qualify for exemption." Courts have explained, "[t]he combination exemption addresses the situation in which an 'employee perform[s] duties that fall under more than one individual exemption, none of which separately represents her primary duty . . . In other words, the combination exemption provides a mechanism for cobbling together different exempt duties for purposes of meeting the primary-duty test.'" *Schmidt v. Eagle Waste & Recycling Inc.,* 598 F.Supp. 2d 928, 937 (W.D. Wis. 2009)

(quoting *IntraComm, Inc. vs. Bajaj,* 492 F.3d 285, 294 (4th Cir. 2007)). The Court has determined that Elliott's primary duty consisted of managerial work under the executive exemption, and thus the combination exemption does not apply. *See Hundt v. DirectSat U.S.A., L.L.C.,* 294 F.R.D. 101, 113 (N.D. Ill. 2013).

Because there exists a genuine dispute of material fact regarding the fourth requirement under the FLSA executive exemption, Defendant's Motion for Summary Judgment is denied. The Court denies Summary Judgment on the AMWA claim for the same reasons it denies the FLSA claim.

### IV.  **CONCLUSION**

Defendant failed to satisfy its burden on summary judgment of demonstrating that Elliott qualified as a bona fide executive employee under the FLSA and AMWA.  Accordingly, Defendant's Motion for Summary Judgment (Dkt. No. 27) is denied.

**IT IS SO ORDERED.**


_____
    Harry D. Leinenweber, Judge
    United States District Court

Dated: 7/19/2023

- 22 -